612 So.2d 929 (1993)
James M. BRENNAN
v.
SHELL OFFSHORE, INC., et al.
No. 92-CA-0353.
Court of Appeal of Louisiana, Fourth Circuit.
January 14, 1993.
Writ Denied March 26, 1993.
*930 Charles M. Raymond, New Orleans, for defendant/appellant, Shell Offshore, Inc.
Charles M. Steen, William J. Riviere, Phelps Dunbar, New Orleans, for defendant/appellee, Ray Gibbins Maintenance, Inc.
Before BARRY, BYRNES and WARD, JJ.
BARRY, Judge.
Shell Offshore, Inc. satisfied a judgment in favor of James Brennan, a Jones Act seaman employed by Ray Gibbins Industries, Inc. Shell appeals the denial of its cross-claim for indemnity against Gibbins.
Brennan primarily worked as a welder aboard a jack-up vessel and on a Shell rig in Main Pass. On June 22, 1989 he was on a barge leased by Shell when he injured his lower back while moving pipe to a Shell jo-boat. Brennan sued Shell and Gibbins under the Jones Act and general maritime law. Gibbins settled during trial. Shell cross-claimed against Gibbins based on an indemnity clause in their contract.
According to the Jones Act judgment and jury verdict form (introduced in this cross-claim by Shell) Brennan was found to be 23.75% negligent and Shell 76.25% negligent. Paragraph V of Shell's supplemental cross-claim provides: "Shell Offshore, Inc. was found liable and judgment of $199,902.08 was awarded ... against Shell...."
Shell submits that the court erred in its conclusion that Shell's contract with Gibbins was not maritime in nature and the Louisiana Oilfield Indemnity Act nullified their indemnity agreement. Shell also claims that on the negligence issue the court erroneously incorporated the jury's Jones Act findings into its judgment without making independent findings of fact.

THE LAW
A contract which is maritime in nature is governed by maritime law. If a contract is not maritime in nature Louisiana law applies and an indemnity agreement may be declared null under the Louisiana Oilfield Indemnity Act, La.R.S. 9:2780 A which provides:
The legislature finds that an inequity is foisted on certain contractors and their employees by the defense or indemnity provisions, either or both, contained in some agreements pertaining to wells for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, to the extent those provisions apply to death or bodily injury to persons. It is the intent of the legislature by this Section to declare null and void and against public policy of the state of Louisiana any provision in any agreement which requires defense and/or indemnification, for death or bodily injury to persons, where there is negligence *931 or fault (strict liability) on the part of the indemnitee, or an agent or employee of the indemnitee, or an independent contractor who is directly responsible to the indemnitee.
The primary issue is whether the contract between Shell and Gibbins is maritime. If the agreement consists of a blanket contract and later work orders, all the documents must be interpreted together to determine maritime status. Jurisprudentially there are six factors which direct the fact-specific inquiry into whether a contract is maritime:
(1) The work order in effect at the time of injury;
(2) The work performed by the crew;
(3) Whether the vessel was in navigable waters;
(4) To what extent did the work relate to the mission of the vessel;
(5) The primary work of the injured worker;
(6) The work being done at the time of injury.
Domingue v. Ocean Drilling and Exploration Company, 923 F.2d 393, 395-96 (5th Cir.1991), cert. denied ___ U.S. ___, 112 S.Ct. 874, 116 L.Ed.2d 779 (1992) quoting from Davis & Sons Inc. v. Gulf Oil Corporation, 919 F.2d 313, 316 (5th Cir. 1990).
Seaman status is only one basis to determine if maritime law is applicable. The contractual relationship between the contractor and the oil company is not governed by the same considerations. Clement v. Pressure Services, Inc., 526 So.2d 1338 (La. App. 4th Cir.1988), citing Lefler v. Atlantic Richfield Co., Inc., 785 F.2d 1341 (5th Cir. 1986).
The Louisiana Oilfield Indemnity Act nullifies a contractual provision that provides for a legal defense or indemnity where the indemnitee is at fault. Meloy v. CONOCO, Inc., 504 So.2d 833 (La.1987). See also Doucet v. Gulf Oil Company, 783 F.2d 518 (5th Cir.1991), cert. denied 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986).

THE RECORD
Shell introduced the Jones Act judgment which held it liable and the verdict form wherein the jury found Shell 76.25% and Brennan 23.75% at fault. Shell also introduced a number of photographs and its July 15, 1987 blanket order with Ray Gibbins Maintenance Inc. (Ray Gibbins Industries Inc. is the parent company) which states that Gibbins was to provide:
All necessary tools and equipment, materials (except SOI-furnished materials), labor and supervision to: Furnish primary contract labor and/or welding services (contract labormaintenance program) as requested by SOI's production and drilling foremen assigned to our east, west and coastal divisions (offshore use only). SOI shall furnish lodging and food whenever necessary.
Paragraph 11 of the liability/indemnity provision on the back of the order provides in pertinent part:
Except as stipulated above in this Article 11, and to the maximum extent permitted by applicable law (but no further), CONTRACTOR [Gibbins] shall defend, indemnify and hold harmless BUYER [Shell], its parent and subsidiary companies, coventurers, and directors, employees and agents of such companies against any loss, damage, claim, suit, liability, judgment and expense (including attorneys' fees and other costs of litigation), and any fines, penalties and assessments, arising out of injury, disease or death of persons or damage to or loss of any property (including but not limited to BUYER'S existing facilities) or the environment resulting from or in connection with performance or nonperformance of work under this Order by CONTRACTOR, its agents or sub-contractors, even though caused by the concurrent and/or contributory negligence (whether active or passive or of any kind or description) or fault of a party indemnified, subject to the next succeeding sentence herein. Without regard to the extent of negligence, if any, of an indemnified party, CONTRACTOR, at its expense, shall defend any such claim or suit against an *932 indemnified party and shall pay any judgment resulting therefrom. If, after CONTRACTOR has both defended any such suit and paid any resulting judgment, it is judicially determined that the injury, disease, death or damage was caused by the sole negligence of a party indemnified, then BUYER shall reimburse CONTRACTOR for the judgment and for reasonable defense costs incurred. BUYER shall have the right but not the duty to participate in the defense of any such claim or suit with attorneys of its own selection without relieving CONTRACTOR of any obligations hereunder....
Shell also submitted exhibits of two subsequent blanket orders dated June 7, 1988 and August 1, 1988. According to the August 1, 1988 order for contract labor, Gibbins was to provide ongoing labor on a routine basis at the Citrus Unit and the East Bay Fields Unit. To the indemnity provision in paragraph 11 (quoted above) after the words "agents or subcontractors" was added:
(including but not limited to employment decisions or employee relations practices or policies of the contractor, its agents or subcontractor made or instituted in connection with performance of this order)

THE TESTIMONY
James Brennan testified that he was working for Roy Gibbins Industries when he was injured on July 22, 1989. Brennan was assigned to a Shell supervisor, Frank Barron, to whom he reported daily. He was on a jack-up barge servicing the Main Pass and moved from location to location by way of the jack-up barge or a jo-boat. Two roustabouts worked with him. Most of his welding work was done on the deck of the jack-up barge, but he also did repair work on other barges when there were problems. He changed propellors and shafts, helped clean the bilge and checked the oil in the motors. He operated the crane on the jack-up barge and steered the barge through the fields.
Brennan said he was working on the Harold Bell, a jack-up barge, when he hurt his back. Mallard was the jo-boat which transported him to different locations. The jo-boat would back up to the materials barge. On the day of the accident Brennan was welding and fitting jackets at three different locations. Barron decided that a riser was needed and Brennan was transported by jo-boat back to the materials barge. Brennan jumped from the jack-up barge onto the jo-boat with the other helpers, went to the materials barge, grabbed the riser pipe and injured his back. However, he went back to the jack-up barge and finished his work.
Brennan said he generally slept at the central quarters located at the mouth of the Mississippi River (half on land and half in the water). He ate breakfast and dinner there and lunch on the elevating boat or jack-up barge. All types of oilfield equipment were placed on the elevating boat. He estimated that 75% of his job was welding, often welding jackets which were on fixed structures. Maintenance work on the jack-up barge was 25% of his work.
John Blackmon, Shell's maintenance specialist, was assigned to Main Pass, Block # 69. The oil platforms were located in the bay which was an extension of the Gulf of Mexico. Blackmon said most smaller oil wells were surrounded by jackets. Workers went to the platforms by jo-boats and jack-up barges. Shell leased the Harold Bell, a jack-up vessel. The jack-up barges used for field maintenance had legs which could be moved up and down in the water. They were used to distribute supplies and materials and to serve as a place for maintenance and repair work on the platforms. When a boat was jacked up it became a work area for the platforms. When jacked down it was a navigable boat. Rented barges, such as the Harold Bell, had their own skippers and the crew consisted of a Shell supervisor, a welder, a welder's helper and a couple of roustabouts.
According to Blackmon, a typical day for a Gibbins employee was to load supplies and materials onto the barge which was motored to a location. Most of the welding occurred on the barge after it was jacked-up to form a fixed area. Some work took *933 place on the well heads and platforms and two or three locations would be serviced in a day. The jo-boat, faster than a barge, transported people to and from the barge, carried materials and checked locations. There was usually one jo-boat assigned to a jack-up barge and a Shell supervisor piloted the jo-boat.
Garland Guidry, president of Ray Gibbins Industries, testified that Ray Gibbins Industries was the parent corporation of Ray Gibbins Maintenance Inc. There were eight to ten Gibbins employees at the Shell Offshore Main Pass # 69 at the time of the accident. He stated that his company did not provide vessels as part of its contract at Block # 69. According to the blanket order Gibbins provided contract labor for roustabouts and welders. Guidry would receive a request for laborers, would send them out, and a Shell supervisor would assign the daily work. Some men worked on jack-up barges and some on fixed structures. Guidry assigned men to a Shell supervisor not a vessel. The blanket order did not state that Brennan was to work on a vessel. Guidry sent the men to the central facility and the Shell supervisor told them where to go.
Earl Jackson, Shell's senior buyer responsible for managing marine support and maintenance contract services, testified he negotiated the contract with Gibbins. He evaluated the bid information and awarded a contract to companies that provided the best value. After a basic contract was set yearly alterations were negotiated. The contract between Shell and Gibbins was for contract labor at the Citrus Unit and the East Bay Side Fields Unit where work was primarily over water. He stated the Harold Bell was leased, but Shell also owned jo-boats working in the East Bay. Shell leased various flat deck barges from Continental Barges.
The trial court stated in reasons for judgment that Brennan primarily worked on a jack-up barge, and the blanket contract between Shell and Gibbins provided for welders, laborers and related labor. The court was convinced that the contract was nonmaritime because it provided for labor at platforms and production facilities in a specified field of operations. The court said that at the time of Brennan's injury he was engaged in nonmaritime activities, i.e., he was assigned to Shell as a welder/fitter to do maintenance work on platforms even though most of his welding occurred on jack-up barges. On the day of the accident Brennan was doing general welding and fitting at three different platforms. He was attaching jackets to the platforms from a jack-up barge leased by Shell and secured to the platform. Although he was injured while moving pipe from a materials barge to a jo-boat, the pipe was to be attached to a fixed platform. Applying the six jurisprudential factors in Davis & Sons, 919 F.2d at 316, the court concluded that Brennan was performing nonmaritime work.
The court noted that the jury in Brennan's Jones Act trial decided that Shell and Brennan shared responsibility for his accident and no third party was involved, as reflected on the jury's interrogatories. The court concluded that because of Shell's negligence it could not enforce the contractual indemnity provision.

ANALYSIS
The first Davis factor focuses on the specific work order at the time of the injury. The July 15, 1987 blanket order established that Gibbins was to furnish necessary equipment, "labor and/or welding services (contract labor-maintenance program)" as requested by Shell's production and drilling foreman. June 7, 1988 and August 1, 1988 changes were issued to extend the blanket order through August 31, 1989 and to amend the agreement to declare that Gibbins would provide ongoing contract labor on a routine basis for the Citrus Unit and East Bay Fields Unit.
Garland Guidry, Gibbins' president, testified that he would receive a request from Shell to provide certain labor under the blanket order. The welding and maintenance work in the written orders requested by Shell were not maritime in nature. Brennan was the welder/fitter with a three man Gibbins crew working from a jack-up *934 barge (similar to a fixed platform when jacked up) which serviced the Main Pass platform. He was assigned to Frank Barron, a Shell supervisor, not a vessel. He did most of his welding on the deck of the barge after it was jacked-up. Brennan did welding repairs and maintenance on the barge, but only when the barge broke down or to upgrade the barge to meet Coast Guard standards.
Brennan testified that on the day of the accident he was welding, needed a riser pipe for one of the jackets and got on the jo-boat to go to the materials barge. After lifting the pipe onto the jo-boat, Brennan, Barron and the crew motored back to the jack-up barge where the pipe was welded into a jacket and placed on the fixed platform. Brennan testified that 75% of his work was welding.
The jackets Brennan welded were attached to fixed platforms. The fact that the welding occurred on a jack-up barge is not determinative. The barge when jacked up was similar to a fixed platform. We conclude that the trial court correctly determined that the contract was basically nonmaritime.
The analysis does not end there. If the contract is not maritime in nature, the Louisiana Oilfield Indemnity Act applies. Whether the indemnity provision is valid depends on whether the indemnitee, Shell, was at fault. The trial court did not make an independent determination as to Shell's fault based on the cross-claim record; rather, it noted the jury's finding in the Jones Act claim that Shell and Brennan were the only parties at fault. The court said that Shell could not recover against Gibbins because of its negligence. Shell argues the court should have made its own determination and that Gibbins, not Shell, was negligent. However, Shell admitted its negligence when it introduced the judgment and jury's interrogatories which show Shell (76.25%) and Brennan (23.75%) were negligent.
La.C.C. art. 1853 states that a judicial confession is "a declaration made by a party in a judicial proceeding" which "constitutes full proof against the party who made it." The cross-claim declarations and introduction of the judgment and jury interrogatories by Shell were tantamount to a judicial confession. Under La.C.C. art. 1853 (and its predecessor art. 2291) the confession must be the express acknowledgement of an adverse fact which waives evidence as to the subject of the admission or withdraws the matter from issue. The other party must be led to believe the fact was not at issue or relied on the confession to his detriment. Cheatham v. City of New Orleans, 378 So.2d 369 (La.1979); Jones v. Gillen, 564 So.2d 1274 (La.App. 4th Cir.1990), writs denied 568 So.2d 1080-81 (La.1990).
The trial court correctly determined that the contract between Gibbins and Shell was nonmaritime in nature. Shell introduced into evidence the judgment which declared it was negligent and it cannot now recover under the indemnity provision of the contract.
The judgment is affirmed.
AFFIRMED.