# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 05-1353

**DARREL WAYNE MEARS**

**VERSUS**

**COMMERCIAL GENERAL LIABILITY INSURER OF/AND GLOBAL INDUSTRIES OFFSHORE, LLC**

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 01-5194
HONORABLE ROBERT LANE WYATT, DISTRICT JUDGE

**********

**ELIZABETH A. PICKETT
JUDGE**

**********

Court composed of Marc T. Amy, Elizabeth A. Pickett, and J. David Painter, Judges.

**AFFIRMED.**

James Buckner Doyle
Attorney at Law
1304 Enterprise Blvd, 2nd Fl
Lake Charles, LA 70602
(337) 433-5999
Counsel for Defendant-Appellee:
Clarendon Insurance Company

Michael Joseph Juneau
Juneau Law Firm
P.O. Drawer 51268
Lafayette, LA 70503
(337) 269-0052
Counsel for Defendants-Appellees:
Lexington Insurance Company
C & G Welding, Inc.

Robert Michael Kallam
Preis, Kraft, & Roy
P. O. Drawer 94-C
Lafayette, LA 70509
(337) 237-6062
Counsel for Defendant-Appellant:
Global Industries Offshore, LLC

**Pickett, Judge.**

The appellant, Global Industries Offshore, LLC (Global), appeals a judgment of the trial court finding that C&G Welding, Inc. (C&G), and its insurers, Lexington Insurance Company (Lexington) and Clarendon America Insurance Company (Clarendon), are not required to defend, indemnify or insure Global in this suit by an employee of C&G against Global.

## STATEMENT OF THE CASE

Darrell Wayne Mears was an employee of C&G when he was injured in the course and scope of his employment. At the time Mr. Mears was injured, he was working off the coast of Louisiana pursuant to a Marine Master Service Contract between C&G and Global. The primary job Mr. Mears was working on as a welder was the construction of an offshore structure. While being transferred from the DLB *Cherokee*, a navigable vessel, by means of a crane and basket attached to the DLB *Cherokee*, to the scaffolding affixed to the offshore structure, Mr. Mears alleges the basket struck the leg of the structure under construction, causing injuries to his leg and back. As a result of his injuries, Mr. Mears sued Global.

Global filed a third party demand against C&G and its insurers, Lexington and Clarendon, alleging that, pursuant to the Marine Master Service Contract, C&G would defend, indemnify and hold Global harmless against the claims asserted by Mears. C&G and its insurers answered the third party demand by asserting that the contract was a non-maritime contract, thus, pursuant to the Louisiana Oilfield Indemnity Act (LOIA), La.R.S. 9:2780, the indemnity agreement in the Marine Master Service Contract was null and unenforceable. If, however, the contract was a maritime contract as asserted by Global, the Longshore and Harbor Worker's

Compensation Act (LHWCA), through the Outer Continental Shelf Lands Act (OCSLA), would apply, and the indemnity agreement would be enforceable.

Both Global and C&G and its insurers filed motions for summary judgment in the trial court seeking a determination of whether the contract was a maritime contract or not. Following a hearing on July 19, 2005, the trial court found the contract was not a maritime contract and thus was subject to the LOIA. As a result, it granted the motions for summary judgment filed by C&G, Lexington, and Clarendon. The trial court signed a judgment dismissing Global's third-party demands against C&G, Lexington and Clarendon on July 25, 2005. It issued written reasons for its ruling on August 3, 2005. Global now appeals that judgment.

## ASSIGNMENTS OF ERROR

Global asserts two assignments of error :

1. The trial court committed manifest and legal error in finding the contract at issue to be non-maritime and in not performing the proper legal analysis to determine that the contract was maritime when the contract required the services of a vessel in navigation, required the workers providing welding services thereunder to be exposed to the perils of the sea, required these welders to be transported multiple times per day from a vessel to an offshore structure over navigable waters in a basket and/or gangway, required the workers be transported by the vessel en route to the jobsite and when the accident in question occurred in the Gulf of Mexico over navigable waters puportedly caused by an instrumentality (i.e., a crane) of the vessel.

2. The trial court erred in granting the summary judgment of C&G and its insurers by ruling that Global was not an additional assured under the Lexington Insurance Company and/or Clarendon America Insurance Company policies due to the fact that pursuant to the Longshore and Harbor Workers' Compensation Act, which is applicable to this matter via the Outer Continental Shelf Lands Act, allows such enforceability and Louisiana's Oilfield Indemnity Act should not be applied because it is inconsistent with this federal law, i.e., the Longshore and Harbor Workers' Compensation Act.

2

# DISCUSSION

Appellate courts review summary judgments de novo under the same criteria that govern the trial court's consideration of whether a summary judgment is appropriate. *Schroeder v. Bd. of Supervisors of La. State Univ.*, 591 So.2d 342 (La.1991). The mover is entitled to judgment if the pleadings, depositions, answers to interrogatories and admissions on file, together with supporting affidavits, if any, show there is no genuine issue of material fact and the mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966(B).

There are no genuine issues of fact in this case. The only issue is how to apply the relevant law to the facts. The issue before us is whether the contract between Global and C&G is a maritime or non-maritime contract. If the contract is maritime in nature, the defense and indemnification provisions in the contract are enforceable. If the contract is non-maritime, the defense and indemnification provisions are invalid pursuant to the LOIA. The Louisiana Oilfield Indemnity Act, La.R.S. 9:2780, states in pertinent part:

> A. The legislature finds that an inequity is foisted on certain contractors and their employees by the defense or indemnity provisions, either or both, contained in some agreements pertaining to wells for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, to the extent those provisions apply to death or bodily injury to persons. It is the intent of the legislature by this Section to declare null and void and against public policy of the state of Louisiana any provision in any agreement which requires defense and/or indemnification, for death or bodily injury to persons, where there is negligence or fault (strict liability) on the part of the indemnitee, or an agent or employee of the indemnitee, or an independent contractor who is directly responsible to the indemnitee.
>
> B. Any provision contained in, collateral to, or affecting an agreement pertaining to a well for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, is void and unenforceable to the extent that it purports to or does provide for defense or indemnity, or either, to the indemnitee against loss or liability

3

for damages arising out of or resulting from death or bodily injury to persons, which is caused by or results from the sole or concurrent negligence or fault (strict liability) of the indemnitee, or an agent, employee, or an independent contractor who is directly responsible to the indemnitee.

C. The term "agreement," as it pertains to a well for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, as used in this Section, means any agreement or understanding, written or oral, concerning any operations related to the exploration, development, production, or transportation of oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, including but not limited to drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, plugging, or otherwise rendering services in or in connection with any well drilled for the purpose of producing or excavating, constructing, improving, or otherwise rendering services in connection with any mine shaft, drift, or other structure intended for use in the exploration for or production of any mineral, or an agreement to perform any portion of any such work or services or any act collateral thereto, including the furnishing or rental of equipment, incidental transportation, and other goods and services furnished in connection with any such service or operation.

D. (1) The provisions of this Section do not affect the validity of any insurance contract, except as otherwise provided in this Section, or any benefit conferred by the workers' compensation laws of this state, and do not deprive a full owner or usufructuary of a surface estate of the right to secure an indemnity from any lessee, operator, contractor, or other person conducting operations for the exploration or production of minerals on the owner's land.

(2) Any language in this Section to the contrary notwithstanding, nothing in this Section shall affect the validity of an operating agreement or farmout agreement, as defined herein, to the extent that the operating agreement or farmout agreement purports to provide for defense or indemnity as defined in Subsection B of this Section. This exception shall not extend to any party who physically performs any activities pursuant to any agreement as defined in Subsection C of this Section. For purposes of this Subsection, operating agreement and farmout agreement shall be defined as follows:

(a) "Operating agreement" means any agreement entered into by or among the owners of mineral rights for the joint exploration, development, operation, or production of minerals.

4

(b) "Farmout agreement" means any agreement in which the holder of the operating rights to explore for and produce minerals, the "assignor", agrees that it will, upon completion of the conditions of the agreement, assign to another, the "assignee", all or a portion of a mineral lease or of the operating rights.

. . . .

G. Any provision in any agreement arising out of the operations, services, or activities listed in Subsection C of this Section of the Louisiana Revised Statutes of 1950 which requires waivers of subrogation, additional named insured endorsements, or any other form of insurance protection which would frustrate or circumvent the prohibitions of this Section, shall be null and void and of no force and effect.

. . . .

I. This Act shall apply to certain provisions contained in, collateral to or affecting agreements in connection with the activities listed in Subsection C which are designed to provide indemnity to the indemnitee for all work performed between the indemnitor and the indemnitee in the future. This specifically includes what is commonly referred to in the oil industry as master or general service agreements or blanket contracts in whatever form and by whatever name. The provisions of this Act shall not apply to a contract providing indemnity to the indemnitee when such contract was executed before the effective date of this Act and which contract governs a specific terminable performance of a specific job or activity listed in Subsection C.

This court, in *Fontenot v. Southwestern Offshore Corp.*, 99-1559 (La.App. 3 Cir. 7/5/00), 771 So.2d 679, *writ denied*, 00-2346 (La. 11/3/00), 773 So.2d 144, provides a thorough discussion on the determination of whether a contract is maritime or non-maritime. As this court in *Fontenot* correctly pointed out:

In *Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313, 316 (5 Cir.1990) (emphasis added), the United States Fifth Circuit adopted the following inquiry for determining whether a contract is maritime or not:

Determination of the nature of a contract depends in part on *historical treatment in the jurisprudence* and in part on *a fact-specific inquiry*. We consider six factors in characterizing the contract: 1) what does the specific work

5

order in effect at the time of the injury provide? 2) what work did the crew assigned under the work order actually do? 3) was the crew assigned to work aboard a vessel in navigable waters; 4) to what extent did the work being done relate to the mission of the vessel? 5) what was the principal work of the injured worker? 6) what work was the injured worker actually doing at the time of injury?

*Fontenot,* 771 So.2d at 683.

To determine if the contract at issue is a maritime contract, we must apply the *Davis* factors to the facts of this case.

1.)    What does the specific work order in effect at the time of the injury provide?

There is not a specific work order in the record. Mr. Mears' job was to perform welding services on the fixed platform. He was transported to and from the platform on a basket attached to a crane on the barge on which he slept and ate while not working on the platform.

2.)    What work did the crew assigned under the work order actually do?

Mr. Mears and his crew were welders who were engaged in attaching a caisson to a fixed platform.

3.)    Was the crew assigned to work aboard a vessel in navigable waters?

The record suggests that there was some preparatory work done on the barge in order to move pieces of equipment from the barge to the platform. At times, if the seas were rough, they would do some work aboard the vessel if moving from the vessel to the platform was too dangerous. Primarily, though, the welding was done on the platform.

4.)    To what extent did the work being done relate to the mission of the vessel?

6

The vessel was a place where the welding crew slept and ate and where materials and equipment for the construction of the platform were transported and stored. The actual work of welding was not related to the mission of the vessel.

5.)    What was the principal work of the injured worker?

Mr. Mears was a welder.

6.)    What work was the injured worker actually doing at the time of injury?

Mr. Mears was getting onto a basket attached to a crane from the fixed platform to be transported back to the barge.

Applying the *Davis* factors to our facts, we find this to be a non-maritime contract. The jurisprudence supports this conclusion.

Global argues that the fact that the navigable vessel was necessary for the work to be performed is an overriding factor which requires a finding that the contract is maritime. In fact, the relationship between the vessel's mission and the contractual obligations of C&G is the determining factor. The mission of the vessel in this case was to provide quarters for the welders employed by C&G. The contract between C&G and Global was for C&G to provide welders to build an offshore platform. Mr. Mears did not actually work from the vessel. He worked on the offshore platform or the temporary scaffolding affixed to the platform. Though the vessel did provide the means for C&G's employees to gain access to their worksite, their actual work did not further the mission of the vessel.

In *Brennan v. Shell Offshore, Inc.*, 612 So.2d 929 (La.App. 4 Cir.), *writ denied*, 614 So.2d 1268 (La.1993), the court found that a contract in which a welder was required to weld jackets to a fixed platform was non-maritime even though the welding occurred from a jack-up barge.

7

In *Wagner v. McDermott, Inc.*, 899 F. Supp. 1551 (W.D.La. 1994), *affirmed*, 79 F.3d 20 (5th Cir. 1996), Wagner was an employee of Landry Enterprises. Landry Enterprises contracted with McDermott Enterprises to provide welding services for McDermott in the construction of a fixed offshore platform. Wagner slept and ate on a derrick barge adjacent to the fixed platform. He slipped and fell on the deck of the barge and sued McDermott. McDermott sought indemnity from Landry pursuant to the terms of the blanket services contract. The district court applied the *Davis* factors and determined the contract was non-maritime because it only touched incidentally on the barge. The Fifth Circuit affirmed the district court and adopted its reasoning. This case appears most analogous to our fact situation.

In the second assignment of error, Global asks this court to find that even if the LOIA is applicable and the defense and indemnity provisions of the contract are unenforceable, the obligation of C&G to name Global as an additional insured is enforceable. The LOIA clearly prohibits these additional insured requirements in section G, which states:

> Any provision in any agreement arising out of the operations, services, or activities listed in Subsection C of this Section of the Louisiana Revised Statutes of 1950 which requires waivers of subrogation, additional named insured endorsements, or any other form of insurance protection which would frustrate or circumvent the prohibitions of this Section, shall be null and void and of no force and effect.

Global argues that this section is inconsistent with the LHWCA and should not be given effect. The United States Fifth Circuit has held that there is not a conflict in a similar situation and the LOIA applies. *See Hogden v. Forest Oil Corp.*, 87 F.3d 1512 (5th Cir. 1996).

## CONCLUSION

We find the trial court's determination that the contract at issue is non-maritime and therefore subject to the LOIA is correct. The indemnity agreement contained in the contract is, therefore, unenforceable. The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Global Industries Offshore, LLC.

**AFFIRMED.**