691 So.2d 715 (1997)
Finley Richard HOWELL
v.
AMERICAN CASUALTY CO. OF READING, PENNSYLVANIA, Tilden Elliott Contractors, Inc. and Chevron, U.S.A., Inc.
No. 96-CA-0694.
Court of Appeal of Louisiana, Fourth Circuit.
March 19, 1997.
Rehearing Denied April 30, 1997.
*719 Bruce R. Hoefer, Jr., Ben O. Schupp, Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, for Defendant/Appellant Chevron U.S.A., Inc.
Joseph G. Gallagher, Jr., Hulse & Wanek, New Orleans, for Defendant/Appellant American Casualty Company of Reading, Pennsylvania.
D. Kirk Boswell, John A. Scialdone, Terriberry, Carroll & Yancy, L.L.P., New Orleans, for Defendant/Appellant Rupert Murray Collins, as Lloyd's Underwriters' Nominee.
Robert A. Redwine, New Orleans, William J. Larzelere, Richard E. Jussaume, Jr., Larzelere & Picou, L.L.P., Metairie, for Defendant/and Third-Party Plaintiff/Appellant and Third-Party Defendant/Appellee Tilden J. Elliott Contractor, Inc.
Walter Landry Smith, Baton Rouge, and Philip F. Cossich, Jr., Belle Chasse, for Plaintiff/Appellant Finley Richard Howell.
Before ARMSTRONG, JONES and MURRAY, JJ.
ARMSTRONG, Judge.
This is a maritime personal injury action. The plaintiff, Finley Richard Howell, was employed by defendant Tilden J. Elliott Contractors, Inc. ("Elliott") aboard the self-propelled barge M/V BIG JIM. The BIG JIM was owned by defendant Chevron U.S.A., Inc. ("Chevron"). Elliott, pursuant to a contract with Chevron, supplied the entire crew of the BIG JIM which consisted of a foreman, Mr. Howell as the crane operator, two welders, two welders' helpers, and two riggers. The BIG JIM was used in coastal waters of the Gulf of Mexico to perform work on Chevron oil and gas platforms.
Mr. Howell suffered a back injury in an accident during the placing of a hatch cover on one of the Chevron platforms on April 20, 1988. That injury became extremely painful and symptomatic while Mr. Howell was routinely tightening a bolt at work on May 9, 1988. Mr. Howell ceased work for Elliott on that date. One of Elliott's insurers, American Casualty Company d/b/a CNA Insurance Companies ("CNA"), began to pay maintenance and cure benefits to Mr. Howell. Also, Mr. Howell underwent extensive medical *720 treatment, including spinal surgery in October, 1988. His doctor released him to work in January, 1989 and CNA ceased maintenance and cure payments. At that time, he attempted to return to work with Elliott, but was told that there was no work for him, so he went to work with Delta Well Surveyors in February or March, 1989. He left that job in November, 1989 due to a personality conflict with a supervisor. He then sought other employment but, in November, 1989, while changing a car tire, he again began to experience serious back pain and symptoms.
Mr. Howell sought reinstatement of the maintenance and cure benefits after the tire changing incident but that request was refused. He then filed suit against Elliott, Chevron, Elliott's primary insurer, CNA and Elliott's excess insurer, Underwriters at Lloyd's ("Lloyd's"). Mr. Howell alleged claims under the Jones Act for negligence, under the general maritime law for unseaworthiness, for maintenance and cure, for punitive damages for failure to reinstate maintenance and cure, and for retaliatory discharge. CNA and Lloyd's each denied coverage. Elliott cross-claimed for coverage against CNA and Lloyd's. Chevron crossclaimed against Elliott for contractual indemnity and for indemnity by operation of law. Chevron denied status as a Jones Act employer of Mr. Howell and denied vicarious liability for Elliott's other employees who caused the April 20, 1988 accident. Chevron also sought to limit its liability to the value of the BIG JIM by raising the federal Limitation of Vessel Owners Liability Act by way of an affirmative defense in this action but did not file a concursus limitation proceeding in federal court.
Following a bench trial, the trial court found for Mr. Howell and against all the defendants and awarded judgment for Mr. Howell and against all defendants for $150,000 general damages. The trial court found for Elliott on its cross-claim against CNA in the amount of $125,000 plus attorney's fees of $66,408.27, later amended to $70,999.88. The trial court dismissed Chevron's indemnity cross-claim against Elliott. In its Reasons for Judgment, the trial court found that Mr. Howell had proven his claim for Jones Act negligence but rejected his claims as to general maritime law unseaworthiness and maintenance and cure (and, thus, punitive damages for failure to reinstate maintenance and cure) and, implicitly, rejected his claim for retaliatory discharge. Also in its Reasons for Judgment, the trial court found that there was no contributory/comparative negligence of Mr. Howell, found coverage under CNA's and Lloyd's insurance policies, held that Chevron was the "borrowing employer" of Elliott's employees so as to be the Jones Act employer of Mr. Howell, and so as to be vicariously liable for the negligence of the Elliott employees who caused the April 20, 1988 accident, and held that it was without jurisdiction to consider Chevron's limitation of liability defense. All parties appeal and, among them, challenge nearly all aspects of the trial court's decision.[1]
We hold as follows. First, the $150,000 general damages judgment in favor of Mr. Howell and against Elliott, Lloyd's and Chevron is increased to $450,000 (except, as to Chevron, the judgment is subject to the limitation of liability discussed in our fifth point below). In that connection, the trial court's determinations of Jones Act negligence, and lack of comparative/contributory negligence of Mr. Howell, are affirmed. We affirm the trial court's determination that maintenance and cure need not have been reinstated in November, 1989 and, in light of that determination, there can be no punitive damages for failure to so reinstate maintenance and cure. Further in that connection, we affirm the trial court's determination that Chevron was the borrowing employer of Mr. Howell and the other Elliott employees on board the BIG JIM. The trial court's implicit rejection of Mr. Howell's claim for retaliatory discharge also is affirmed. Mr. Howell should be awarded lost wages and medical expenses and we will remand for a factual determination of such lost wages and medical expenses.
Second, we hold that CNA's policy limit for this case is $25,000. As it is undisputed that CNA paid a little more than $25,000 in maintenance and cure benefits to Mr. Howell before this action was filed, there is no coverage *721 for Mr. Howell's claim in this action and CNA did not owe Elliott a defense.
Third, we affirm the trial court's finding that there is coverage under the Lloyd's policy for Mr. Howell's claim. The "owned and/or operated" vessel exclusion in the Lloyd's policy is ambiguous in the present context.
Fourth, we hold that Chevron is entitled to contractual indemnity from Elliott. The contract between Elliott and Chevron is a maritime contract, governed by federal admiralty law, and, thus, the indemnity provision in that contract is not void by operation of Louisiana statutory law. As Chevron is entitled to indemnity not only as to its liability to Mr. Howell, but also for its attorney's fees and other expenses of this action, we will remand for proceedings to determine the amount of such attorneys fees and expenses.
Fifth, we hold that state courts do have jurisdiction to consider a defense of limitation of liability under the federal Limitation of Vessel Owner's Liability Act, even absent a federal court limitation concursus proceeding. Under the statute, Chevron's liability is limited to the $125,000 value of the BIG JIM in April 1988 as proven at trial. Accordingly, the judgment in favor of Mr. Howell and against Chevron must be reduced to $125,000.
Sixth, Lloyd's liability for Elliott's costs of defense is limited to Elliott's attorney's fees and other costs of defending itself against Mr. Howell's claims, and does not include Elliott's attorney's fees and other costs of litigating any other matters. We will remand for a determination of Elliott's recoverable attorney's fees and other costs.
Seventh, as Mr. Howell's recovery was under the Jones Act, legal interest on the judgment runs from the date of the accident but only on past damages and not on future damages.

Seaman Status
Some of the defendants argue that Mr. Howell is not a "seaman" so as to be able to recover under the Jones Act. The test for seaman status is that the plaintiff must (1) have duties that contribute to the function of a vessel or to the accomplishment of its mission and (2) have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature. Chandris, Inc. v. Latsis, ___ U.S. ___, ___ - ___, 115 S.Ct. 2172, 2190-91, 132 L.Ed.2d 314 (1995).
Thus, because seaman status is dependent upon the involvement of a "vessel in navigation", we must determine whether the BIG JIM was a vessel in navigation. The BIG JIM was self-propelled with its own engines, twin screws (propellers), steering equipment, rudders, raked bow, and wheelhouse. It had running lights, mooring lines and bits, a lifeboat, and a cabin and kitchen. The BIG JIM worked at many different locations and normally moved from one to the next under its own power. The BIG JIM moved on a daily basis in navigable waters. The trial court found that there is "no question" that the BIG JIM is a vessel and that "vessel status is clearly established." The Supreme Court has emphasized that vessel status is primarily a question for the finder of fact. Ebanks v. Reserve Marine Enterprises, Inc., 625 So.2d 1050 (La.1993), cert. denied, Louis Dreyfus Corp. v. Ebanks, 511 U.S. 1019, 114 S.Ct. 1400, 128 L.Ed.2d 73. The trial court's findings of fact may be disturbed on appeal only if they are clearly wrong or manifestly erroneous. Ambrose v. New Orleans Police Dept. Ambulance Service, No. 93-3099 (La.7/5/94), 639 So.2d 216; Stobart v. State Through Department of Transportation and Development, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989). The record fully supports the trial court's determination of vessel status of the BIG JIM.
Mr. Howell was permanently assigned to the BIG JIM and had been for months by the time of the accident. His duties included operating the BIG JIM's crane which crane was a significant piece of equipment of the BIG JIM. Also, Mr. Howell was responsible for manning the wheelhouse and navigating the BIG JIM when it moved from one location to another. He was also responsible for maintaining the BIG JIM's engines and generators. Obviously, Mr. Howell's duties contributed to the function *722 of the BIG JIM and the accomplishment of its mission. The trial court held that it was "well-satisfied as to Howell's status as a seaman" and that conclusion is obviously correct in light of the above-recited facts.
Some of the defendants argue that Mr. Howell cannot, as a matter of law, establish his seaman status because he testified in his deposition that he did not recall what percentage of his work time he spent on board the BIG JIM. Apparently, during part of the work day Mr. Howell and others of the BIG JIM's crew would go aboard the Chevron platforms that they were servicing. At trial, Mr. Howell testified that he spent about 80% of his work time on the BIG JIM. Some of the defendants argue that Mr. Howell's deposition testimony that he did not recall the percentage of his work time that he spent on board the BIG JIM was a "judicial admission" that he could not contradict at trial. Further, they argue that, in the absence of his testimony as to what percentage of his time he spent on board the BIG JIM, Mr. Howell could not possibly prove his seaman status.
We reject this defense argument for two reasons. First, even if Mr. Howell did not recall the percentage of his work time that he spent aboard the BIG JIM, we do not think that would preclude a finding that he was a seaman. Both his permanent assignment to the BIG JIM and his duties in carrying out the function and mission of the BIG JIM were proven, not only by Mr. Howell's testimony, but also by the contract between Elliott and Chevron which contract specifies what crew members will be supplied (foreman, crane operator, welders, welder's helpers and riggers) and what the duties of each crew member will be. In view of his permanent assignment to the BIG JIM and his duties aboard that vessel (described above), it is obvious that Mr. Howell spent more than a "small fraction of his working time" aboard the BIG JIM and that he was not "fundamentally a land based" worker. Chandris, ___ U.S. at ___, 115 S.Ct. at 2191. Thus, Mr. Howell's seaman status was established independent of his testimony as to the percentage of his work time that he spent aboard the BIG JIM.
Second, Mr. Howell's deposition testimony was not a judicial admission which he could not contradict at trial. "A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it." La.Civ.Code art. 1853. Comment (b) to Article 1853 states: "Under this Article, testimony given on the witness stand by a party, without intention of waiving evidence as to the subject matter of that testimony, or factual allegations made in other proceedings, do not constitute judicial confession." If even "testimony on the witness stand" does not constitute a judicial confession which precludes further evidence on the subject, then deposition testimony does not. Further, Mr. Howell's statement that he did not recall something did not constitute an "express acknowledgment" that a fact was as contended by an opposing party and, therefore, does not constitute a judicial admission. Davis v. Kreutzer, 93-1498 (La.App. 4th Cir. 2/25/94), 633 So.2d 796, writ denied, 94-0733 (La.5/6/94), 637 So.2d 1050; Brennan v. Shell Offshore, Inc., 612 So.2d 929, 934 (La.App. 4th Cir.), writ denied, 614 So.2d 1268 (La. 1993). If any defendant wished to conclusively establish, during discovery, that Mr. Howell did not know the percentage of time he worked aboard the BIG JIM, then they could have attempted to do so with a request for admission pursuant to Articles 1466-68 of the Code of Civil Procedure.

Negligence and Comparative Negligence
Mr. Howell was injured during the course of placing a hatch cover in conjunction with three other Elliott employees. The BIG JIM's crew had taken a number of hatch covers from a Chevron platform to remove trip hazards. The hatch covers then had to be replaced on the Chevron platform. Mr. Howell and three other Elliott employees were carrying one of the hatch covers when the accident occurred. The hatch cover is a large flat piece of metal about the size of a door and weighing about 250 pounds. Mr. Howell and the other three Elliott employees each had one corner. The hatch onto which the cover was to be placed was partly under some stairs. Mr. Howell was holding the *723 corner that was under the stairs and so he was hunched over in a somewhat awkward position. One of the Elliott workers lost his grip, and two others let go, so that the hatch cover fell vertically into the hatch with Mr. Howell left holding it by himself with one hand for a short time. Mr. Howell began to experience pain in his back at this time although, as will be discussed below, his injury progressed later.
The trial court found three types of negligence that contributed to Mr. Howell's injury. First, there was nobody coordinating the efforts of Mr. Howell and the other three Elliott employees. The Elliott foreman, who was in charge of the BIG JIM's crew, was in the wheelhouse at the time of the accident, apparently either sleeping or drinking coffee. If someone who was in a position to observe all four workmen had been present, and could call out directions, then the accident could have been prevented. Second, the three Elliott workers who dropped the hatch cover, leaving Mr. Howell holding it by himself, did not exercise reasonable care and so caused the accident. Third, the BIG JIM's crane could have been used for moving the hatch cover.
In fact, Mr. Howell had raised the topic of using the crane, but the Elliott foreman had refused the suggestion, because the BIG JIM could not be moved over to the side of the platform where the hatches were located because of the presence of underwater oil or gas lines there. However, the crane could have been used from the side of the platform opposite the hatches, even as to the hatch partially located under the stairs, although it would have been somewhat more complicated. If the crane had been used, the accident could have been avoided.
"The slightest negligence is sufficient to sustain a finding of liability under the Jones Act." Mistich v. Pipelines, Inc., 609 So.2d 921, 929 (La.App. 4th Cir.1992) (emphasis added), writ denied, 613 So.2d 996 (La.1993), cert. denied, 509 U.S. 913, 113 S.Ct. 3020, 125 L.Ed.2d 709 (1993), overruled on other grounds, Bridgett v. Odeco, Inc., 93-1536, 94-0112 (La.App. 4th Cir. 12/15/94), 646 So.2d 1249, writ denied, 95-0381, 95-0398 (La.3/30/95), 651 So.2d 840. Accord Osorio v. Waterman Steamship Corp., 557 So.2d 999 (La.App. 4th Cir.), writ denied, 561 So.2d 99 (La.1990). Under this legal standard, which was expressly and properly applied by the trial court and in light of the record as to how the accident occurred, we cannot say that the trial court was clearly wrong or manifestly erroneous in finding Jones Act negligence as the cause of Mr. Howell's injury. Ambrose, supra; Stobart, supra; Rosell; supra.
The defendants argue that Mr. Howell was contributorily/comparatively negligent in causing his injury. The focus of their argument is that Mr. Howell, as the "senior employee," should have been supervising and coordinating the hatch replacement so that the accident could have been prevented. The trial court found, and the record shows, that when the regular foreman was not with the BIG JIM, Mr. Howell would take over as foreman and would be paid at a higher rate. However, on the day of the accident, the Elliott foreman was on the BIG JIM, albeit in the wheelhouse sleeping or drinking coffee, and Mr. Howell was functioning simply as a nonsupervisory employee. Also, the trial court found, and the record reflects, that Mr. Howell, who was under the stairs, was not physically in a position to coordinate the activities of the other workers. The trial court also noted that Mr. Howell had requested of the Elliott foreman that the crane be used to move the hatch covers, but the foreman had refused the request. The trial court concluded: "There was nothing more that Howell could do for his own safety." "A seaman's duty to protect himself is slight, encompassing only that he do the work assigned and not to find the safest method." Slay v. Quarles Drilling Co., 534 So.2d 1300, 1302 (La.App. 4th Cir.1988), writ denied, 536 So.2d 1235 (La.1989). "A seaman's duty to protect himself is slight care, not ordinary care." Mistich v. Pipelines, Inc., 609 So.2d at 932. Accord Osorio v. Waterman Steamship Corp., 557 So.2d at 999. In light of the foregoing legal standard, which was expressly and properly applied by the trial court, and in light of the record as to how the accident occurred, we cannot say that the *724 trial court was clearly wrong or manifestly erroneous in finding that Mr. Howell was not contributorily/comparatively negligent. Ambrose, supra; Stobart, supra; Rosell, supra.

CNA's Insurance Coverage
CNA argues that its policy provides only $25,000 coverage as to Mr. Howell's claim. The CNA policy issued to Elliott is a "Worker's Compensation and Employer's Liability Policy." "Part Two" of the CNA policy provides "Employers Liability Insurance" and the policy limit for that coverage, which is specified on the declarations page of the policy, is $100,000. However, as is referenced on the declarations page, the policy includes a "Maritime Coverage Endorsement" which is attached to the policy. The endorsement provides, in pertinent part, that:
The insurance afforded by Part Two (Employer's Liability Insurance) for bodily injury to a master or member of the crew of a vessel is subject to the following additional provisions.
* * * * * *
Limits of Liability
Our liability to pay for damages is limited. Our limits of liability are shown in the schedule. They apply as explained below.
1. Bodily injury by Accident.
The limit shown for "bodily injury by accident-each accident" is the most we will pay for all damages covered by this insurance because of bodily injury to one or more employees in any one accident.
* * * * * *
Schedule
* * * * * *
3. Limits of Liability
Bodily Injury by Accident $25,000 each accident.
* * * * * *
This endorsement changes the policy to which it is attached[.]
The Supreme Court has held that, as to interpretation of insurance policies:
An insurance contract is to be construed as a whole, and one portion thereof should not be construed separately at the expense of disregarding another.

... If there is an ambiguity in a policy, then that ambiguity should be construed in favor of the insured and against the insurer.
... However, courts have no authority to alter the terms of policies under the guise of contractual interpretation when the policy provisions are couched in unambiguous language.
Pareti v. Sentry Indemnity Co., 536 So.2d 417, 420 (La.1988) (emphasis in original).
Further, Louisiana's Insurance Code adds the elaboration that an insurance policy must be construed as it is modified by endorsements to the policy:
Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to or made a part of the policy.

La.R.S. 22:654 (emphasis added).
Further, it is well-settled in our caselaw that, in the event of any conflict between an endorsement and the main body of an insurance policy, the endorsement prevails. Maggio v. Manchester Ins. Co., 292 So.2d 255, 257 (La.App. 4th Cir.1974); Jefferson Downs, Inc. v. American General Ins. Co., 214 So.2d 244, 247 (La.App. 4th Cir. 1968), writ recalled, appeal dismissed, 256 La. 244, 236 So.2d 27 (1969); St. Paul Fire & Marine Ins. Co. v. Roubion, 252 So. 2d 679, 681 (La.App. 1st Cir.1971); Smith v. Western Preferred Casualty Co., 424 So.2d 375, 376 (La.App. 2d Cir.1982), writ denied, 427 So.2d 1212 (La.1983); Alleman v. Bunge Corp., 779 F.2d 218, 220 (5th Cir.1985).
The endorsement in this case is clear, explicit, and unambiguous. The conclusion is inescapable that, in the case of a claim for bodily injury to a member of the crew of a vessel, the CNA policy's limit is $25,000.
Mr. Howell points out that the CNA policy does not define the term "member of the crew of a vessel." Mr. Howell suggests *725 that perhaps, in some way, he was not a member of the crew of a vessel. "The words of a contract must be given their generally prevailing meaning." La.Civ.Code art. 2047. In light of Mr. Howell's permanent assignment to the BIG JIM, and his duties aboard that vessel, which included manning the wheelhouse and navigating the BIG JIM, maintaining the vessel's engines and generators, and operating the vessel's crane, it is obvious that Mr. Howell was a member of the crew of the BIG JIM. The CNA policy endorsement is applicable to his claim.
Mr. Howell, Elliott and Lloyd's point out that the declarations page and the endorsement reflect that Elliott paid a $500 premium for the Maritime Coverage Endorsement. They also point out that, in the absence of the endorsement, the $100,000 limit of Part Two of the main body of the policy would be applicable. Why, they ask, would Elliott be charged $500 to reduce its coverage from $100,000 generally to $25,000 for claims by masters and members of the crews of vessels? The short answer to this rhetorical question is that it is nonpertinent in light of the clear, explicit and unambiguous language of the endorsement. Pareti supra. Unlike employees in general, who have only limited causes of action against their employers due to the restrictions of state workers' compensation statutes or the federal Longshoreman and Harbor Worker's Compensation Act, masters and members of the crews of vessels have much greater rights against their employers under the Jones Act and the general maritime law. Thus, it is not surprising that an employer might have to pay extra to have even lesser insurance coverage for claims by the masters and members of the crews of vessels.
Also, the CNA policy has to be viewed as part of an overall package of insurance coverage for Elliott put together by an insurance agent. In addition to the primary coverage provided by CNA, there was Maritime Excess Liability coverage provided by two Lloyd's policies. One was for $475,000, which brought the coverage for maritime claims up to an even $500,000, and the other was for $500,000, which brought the coverage for Maritime claims up to an even $1,000,000. Most importantly, the documentation for the $475,000 Lloyd's policy stated that it was to be excess to $25,000 primary coverage. That is an obvious reference to the $25,000 CNA maritime coverage. The two policies fit together, with the CNA policy providing the first $25,000 maritime coverage and the Lloyd's policy picking up after that. There would have been no point in having a CNA policy with $100,000 primary coverage (or any amount over $25,000) for claims of masters and members of the crew of vessels, when the Lloyd's excess policy picked up at $25,000 for such claims.
Elliott argues that a 1974 letter to the Louisiana Insurance Commissioner from the National Council on Compensation Insurance, which letter discussed and submitted for approval a form of Exclusion of Maritime Liability Endorsement, shows that the phrase "members of the crew" in the CNA policy endorsement refers only to "per se crew members" and not to other persons who are held by the courts to be crew members. Elliott then argues that Mr. Howell was not a "per se crew member." In view of Mr. Howell's uncontradicted testimony to the effect that he was the BIG JIM's helmsman, ship's engineer and the operator of the vessel's own crane, we cannot see how he would not be a "per se crew member" regardless of exactly what that term means.
Moreover, there are several problems with Elliott's argument as to the NCCI letter. First, the form of endorsement discussed in and enclosed with the NCCI letter is significantly different than the endorsement to the CNA policy in the present case. Indeed, the NCCI letter is dated June 10, 1974 and the form for the CNA policy endorsement dates from 1984. Second, this very same argument, and the very same NCCI letter, were presented to the court in Williams v. Fab-Con, Inc., 990 F.2d 228, 230-31 (5th Cir.1993), but the court disregarded the NCCI letter and interpreted the term "member of the crew" of a vessel in accordance with Jones Act caselaw as one who performs the work of the vessel and/or contributes to its function or the accomplishment of its mission. Third, the NCCI letter, which is quoted in relevant part in Williams, 990 F.2d at *726 231 n. 2, says that the enclosed revised form of the endorsement, which is an exclusion, "clearly includes employees working in offshore operations not classified as masters or members of a crew of a vessel, when they are adjudged by the courts to be masters or crew members and entitled to remedies under Admiralty Law." In other words, the revised exclusion endorsement applies to, and thus excludes coverage for, employees, even if they are not "classified" as masters or crew members, if they are held to be entitled to maritime law remedies. Of course, Mr. Howell has been held to be entitled to Jones Act remedies. Thus, it is unclear whether the NCCI letter actually supports or contradicts Elliott's coverage argument.
Also, with respect to Elliott's cross-claim against CNA for coverage, particularly with regard to Elliott's argument that CNA should provide Elliott with a defense to Mr. Howell's claim, it is uncontested that CNA paid more than $25,000 in maintenance and cure benefits for Mr. Howell prior to this suit being filed. CNA's policy provides that: "We have no duty to defend or to continue defending after we have paid our applicable limit of liability under this insurance." The Supreme Court has held that, when a policy has a provision that the insurer's duty to defend the insured ends upon the exhaustion of the policy limit by payment of claims or good faith settlements, then that policy provision must be enforced, and the insurer's duty to defend ends upon exhaustion of the policy limit. Pareti v. Sentry Indemnity Co., 536 So.2d 417 (La.1988). Thus, as the CNA policy limit was exhausted before this suit was filed, CNA never owed Elliott a duty to defend Elliott against Mr. Howell's claim.

Coverage Under The Lloyd's Policy
The Lloyd's policy, referred to in the parties' briefs as a Maritime Excess liability ("MEL") policy, contains an "Exclusions" endorsement which states:
With respect to the insurance afforded hereunder, this endorsement overrides and/or is in addition to the terms and conditions of this policy and/or the conditions of the primary/underlying policy/policies including any and all endorsements attached hereto.
The indemnity granted under this policy shall not apply:
(1) To liability to captain and crew of, and employees on assured's owned and/or operated watercraft. (emphasis added)
Just as we must construe the endorsement to the CNA policy as modifying the main body of the CNA policy, we must construe this endorsement to the Lloyd's MEL policy as modifying the Lloyd's MEL policy. La.R.S. 22:654; Pareti, supra; Maggio, supra; Jefferson Downs, supra.
Thus, if the exclusion unambiguously excludes coverage, then we must enforce that contractual language. Pareti, 536 So.2d at 420. However, if there is an ambiguity in the exclusion, then we must construe the ambiguity in favor of the insured (and coverage) and against the insurer. Id.
Lloyd's, conceding that the BIG JIM was owned by Chevron and not Elliott, nevertheless argues that Elliott "operated" the BIG JIM so as to come within the scope of the "owned and/or operated watercraft" exclusion. Unfortunately, Lloyd's policy contains no definition of the word "operate" nor any other clauses or provisions which would aid us in determining the meaning of the term "operate" in the exclusion. Nor did Lloyd's present any expert testimony as to the meaning of the term "operate" in the policy.
Also, unlike the term "own," which has a fairly narrow, fixed meaning in the usual, popular usage, the term "operate" can have myriad meanings depending upon the context. For example, the "operation" of a car by an individual person has a wholly different connotation than the "operation" of a municipal airport by a public transportation authority. The former context connotes emphasis on the hands-on physical control of the car while the latter context connotes emphasis upon abstract legal authority over the airport. The present case, involving the alleged "operation" of a vessel by a corporation, falls somewhere between the extremes of the two examples just given. Elliott, through its employees on board the BIG JIM, had the *727 hands-on physical control of the vessel. Chevron, through its contacts with Elliott, and its supervisors' contacts (at least sometimes daily) with Elliott personnel on the BIG JIM, had the abstract legal authority over the vessel and its activities.
An Elliott representative testified that Elliott did not charter the BIG JIM. There was no evidence that Elliott had the vessel licensed or registered, obtained hull insurance for it, supplied it with fuel, lubricants and spare parts, or undertook the myriad other tasks associated with the operation of a vessel. For all the record reveals, these tasks were all undertaken by Chevron.
In sum, while Lloyd's can advance a plausible view that Elliott "operated" the BIG JIM, Elliott can make an argument at least equally reasonable that it did not "operate" the BIG JIM within the meaning of the term "operate" in the policy exclusion. As there are two reasonable views of whether the term "operate" in the policy applies to the present situation, that term is truly ambiguous, and we must construe it in favor of the insured (and coverage) and against the insurer. Consequently, we find that the exclusion in the Lloyd's policy does not exclude coverage in this case.
Lloyd's also argues that the application for Elliott's insurance included incorrect denials as to the involvement of a vessel in Elliott's work and that those denials amount to misrepresentations which void the policy. The application form apparently was completed by an insurance agent and sent by him to Lloyd's. An Elliott representative testified that he is sure that they would have told the agent of the use of a vessel in Elliott's work. Lloyd's takes the position that the insurance agent was Elliott's agent and, therefore, even if Elliott gave correct information to the insurance agent, the insurance agent's misrepresentations (or mistakes) are attributable to Elliott. In rejoinder, Elliott responds that the insurance agent was Lloyd's agent rather than Elliott's. Lloyd's presented no testimony in support of its theory that the insurance agent was Elliott's agent. The trial court found as a matter of fact that there were no misrepresentations made by Elliott so it is apparent that the trial court was unpersuaded by Lloyd's agency theory. Based on the state of the record, with no testimony in support of Lloyd's agency theory, we certainly cannot hold that the trial court was clearly wrong or manifestly erroneous as to this issue.
The attorney's fees and other litigation costs of Elliott for which Lloyd's is liable are only those which Elliott incurred in defending against Mr. Howell's claim. Lloyd's is not liable for Elliott's attorney's fees and costs incurred in litigating coverage against Lloyd's.
However, the insurance contract did not impose a duty on the insurer to pay attorney's fees in connection with the insured's pursuit of the coverage issue. Nor are we directed to any statute providing for attorney's fees in this instance. Generally, if the insured hires an attorney to represent him in coverage disputes, he will have to bear those costs himself.
Steptore v. Masco Construction Co., Inc., 93-2064 (La.8/18/94), 643 So.2d 1213, 1218. Accord Riley Stoker Corp. v. Fidelity and Guaranty Insurance Underwriters, Inc., 26 F.3d 581, 590 (5th Cir.1994). (Louisiana Law).
Elliott cites La.R.S. 22:658 as authorizing the recovery of its attorney's fees for litigating insurance coverage issues with Lloyd's. However, that statute allows the award of attorney's fees for litigating coverage issues only if the insurer acted arbitrarily and capriciously. The trial court did not find Lloyd's to have acted arbitrarily and capriciously. Further, the situation is such that Lloyd's cannot be said to have acted arbitrarily and capriciously. As to Lloyd's denial of coverage for Mr. Howell's claim against Elliott, Lloyd's has presented good faith, reasonable arguments. No party has pointed out any legal authority which shows Lloyd's coverage defense to have been frivolous. As to Lloyd's refusal to defend Elliott, the duty of Lloyd's to defend as the excess insurer, arises only when the duty of the primary insurer, CNA, ends. In the course of the proceedings below, Elliott, Mr. Howell, and Lloyd's contended, and the trial court held, that CNA's policy limit was $125,000 (or $100,000), and so had not been exhausted by *728 CNA's payment of pre-suit maintenance and cure, so that CNA had the duty to defend Elliott. It was only upon our determination in this appeal that CNA's policy limit was $25,000, and that CNA had no duty to defend because of pre-suit exhaustion of its policy limits, that it became clear that Lloyd's had the duty to defend Elliott. Thus, Lloyd's was not arbitrary and capricious in declining to defend Elliott.
Elliott has incurred other attorney's fees and costs for pursuing coverage against CNA, litigating indemnity with Chevron, pursuing claims against the insurance agency which obtained its insurance, and perhaps other matters that are part of or related to this lawsuit. If Elliott is not entitled to recover from Lloyd's its attorney's fees and other costs for pursuing coverage against Lloyd's, Steptore, supra, then it is not entitled to recover from Lloyd's its attorney's fees and other costs for these other matters which are even further removed from Lloyd's duty to defend Elliott against Mr. Howell's claim.
Apparently, the invoices rendered to Elliott by its attorneys include, not only charges related to defending against Mr. Howell's claim, but also charges for pursuing coverage against Lloyd's as well as charges for the other matters which are part of or related to this lawsuit. We will remand so that the trial court can conduct such evidentiary and/or other proceedings as are necessary to sort out the attorney's fees and other costs incurred in defending against Mr. Howell's claim from all other attorney's fees and costs. The trial court and the parties may resort, not only to the invoices themselves, but to other evidence as well, such as the testimony of Elliott's attorneys. It may be that some charges cannot be characterized strictly as related only to the defense against Mr. Howell's claim or as related only to some other matter. The trial court simply will have to make the best approximate allocation possible as to such charges.
When the amount of attorney's fees and other costs to be awarded to Elliott and against Lloyd's is determined on remand, then legal interest on that amount should begin to run from the date of the trial court's judgment on remand. "The weight of Louisiana authority instructs that fee awards [i.e. defense costs awarded to an insured against an insurer] are not subject to prejudgment interest because reasonable fees are not ascertainable prior to judgment." Riley Stoker Corp. v. Fidelity and Guaranty Insurance Underwriters, Inc., 26 F.3d 581, 590-91 (5th Cir.1994) (collecting cases). See also Alexander v. Burroughs Corp., 359 So.2d 607, 613-14 (La.1978) (interest on attorney's fees awarded in redhibition suit ran from date of judgment rather than date of judicial demand).
Elliott cites Daney v. Haynes, 630 So.2d 949, 955 (La.App. 4th Cir.1993), in which interest on attorney's fees awarded to an insured and against an insurer ran from the date of judicial demand. Daney is distinguishable from the present case in at least two respects. First, Daney involved attorney's fees awarded under La.R.S. 22:658 due to arbitrary and capricious behavior of the insurer which, as discussed above, is not present in this case. But compare Hidalgo v. Old Hickory Ins. Co., 630 So.2d 252, 257 (La.App. 4th Cir.1993), writ denied, 94-0381, 94-0399, (La. 3/25/94), 635 So.2d 240 (La. 1994) (no prejudgment interest on penalties and penalty attorney's fees awarded under La.R.S. 22:658).
Second, in Daney, we held that "since proof of the claim was received [by the insurer] prior to the time the Daneys filed this lawsuit, legal interest should begin the date of judicial demand." 630 So.2d at 955. The implication of the just-quoted statement is that the Daney insurer was on notice to pay the claim even before suit was filed. In contrast, in the present case, Lloyd's is an excess insurer and, until we determined in this appeal that the policy limit of the primary insurer, CNA, is $25,000 and had been exhausted prior to suit, Mr. Howell, Elliott, Lloyd's and the trial court were all of the view that CNA's policy limit had not been exhausted. Had CNA's policy limit not been exhausted, the duty to defend would have been CNA's rather than Lloyd's. In light of the views of the parties and the trial court as to the CNA policy limit issue, it was reasonable for Lloyd's to take the position that it *729 had no duty to defend Elliott. Consequently, Lloyd's stands in a completely different position than did the Daney insurer. Lloyd's was not on notice that it had a duty to defend Elliott until our decision in this appeal and so should not have to pay prejudgment interest on the award to Elliott and against Lloyd's for Elliott's attorney's fees and other costs of defending against Mr. Howell's claim.
Also, because the state of the record as to Elliott's attorney's fees and other costs requires a remand to sort out those related to defending against Mr. Howell's claim, and because Elliott should bear the burden of proving its claim for those attorney's fees and costs, legal interest on the attorney's fees and costs will run from the date they are determined by the trial court's judgment on remand rather than from the date of our decision in this appeal. It is only at that point that the proper amount of Elliott's recoverable attorney's fees and other costs will be "ascertainable." Riley Stoker, supra; Alexander, supra.

Chevron As Borrowing Employer
The trial court rendered judgment against Chevron based on its finding that Chevron was the borrowing employer of Elliott's employees aboard the BIG JIM and the legal consequences that Chevron was a Jones Act employer of Mr. Howell and vicariously liable for the negligence of the other Elliott employees. See generally Guidry v. South Louisiana Contractors, Inc., 614 F.2d 447 (5th Cir.1980). See also Total Marine Services, Inc. v. Director, Office of Worker's Compensation Programs, 87 F.3d 774, 777 (5th Cir. 1996). Of course, that does not necessarily mean that Mr. Howell ceased to be a Jones Act employee of Elliott or that Elliott ceased to be vicariously liable for the negligence of its other employees aboard the BIG JIM. Id. At any rate, the trial court made no ruling on that issue and no such issue is raised by Elliott on appeal.
In Jones Act cases, borrowing employer status is governed by a nine-factor analysis:
Under the borrowed servant doctrine, the responsibility for an employee's injury is placed on the employee's actual employer rather than on his nominal employer. In Ruiz v. Shell Oil Co., the Fifth Circuit spelled out the criteria for the borrowed servant analysis. 413 F.2d 310 (5th Cir. 1969). While stating that "control" over the employee is the centerpiece of the analysis, the court also provided several factors which assist in weighing the degree of control that an employer demonstrates. These factors include:
1) who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?
2) Whose work is being performed?
3) Was there an agreement, understanding or meeting of the minds between the original and the borrowing employer?
4) Did the employee acquiesce in the new work situation?
5) Did the original employer terminate his relationship with the employee?
6) Who furnished the tools and the place for performance?
7) Was the new employment over a considerable length of time?
8) Who had the right to discharge the employee?
9) Who had the obligation to pay the employee?

Id. at 312-13. When weighing these factors, we keep in mind that no one factor, or combination of them, is conclusive. The analysis must be custom fit to each case. Id. at 312; Gaudet v. Exxon Corp., 562 F.2d 351, 356 (5th Cir.1977), cert. denied, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978).
Viator v. Gordon's Trucking Co., 875 F.Supp. 369, 377 (W.D.La.1995). Accord Alday v. Patterson Truck Line, Inc., 750 F.2d 375, 376-77 (5th Cir.1985).
In applying the above legal analysis to this case, the trial court's factual findings as to the borrowing employer issue are helpful:
The evidence in this matter indicates that Chevron did not exercise total control over the work being performed each day on the M/V BIG JIM. In fact, no Chevron *730 employee was even on the vessel at the time of the Plaintiff's injury.
However, compelling in this matter is the "Service Order and Agreement" by which Elliott was employed to perform that work. It hired Elliott for the months of April, May, and June of 1988, for the purpose of performing, "miscellaneous jobs as assigned by a Chevron representative for" those months.
When that language is coupled with other evidence, such as the fact that the Elliott crew worked for no one other than Chevron; Chevron decided what work and where Elliott's barge would go; Chevron decided how Elliott's crew was to be comprised, how much they would be paid; and what tools were to be used, the Court is left with the conclusion that Chevron certainly had reserved to itself the right to control the work being performed pursuant to the contract between the two entities.
In addition to the Service Order and Agreement referred to by the trial court, there was a very extensive written contract formed when Elliott's bid was accepted by Chevron. That contract made it clear that Chevron would monopolize the Elliott crew assigned to the BIG JIM, that the crew would work only on and from the Chevronowned BIG JIM, that those two arrangements would continue for a continuous period of at least several months, and that the Elliott crew had to be acceptable to Chevron. Also, Mr. Howell himself had done only Chevron work for the months he was aboard the BIG JIM.
Chevron points out that its contract with Elliott states that: "Contractor [Elliott] agrees to perform the work as an independent contractor and not as an employee of Company [Chevron]". However, this very same language, in a Chevron contract, was construed and found not to preclude Chevron's borrowing employer status in Alexander v. Chevron, U.S.A., 806 F.2d 526, 528 (5th Cir.1986). The Alexander court affirmed a trial court determination that Chevron was the borrowing employer of a contractor's employee.
Considering the nine factor test, the facts noted by the trial court and other facts in the record, and taking into account the language of the Elliott-Chevron contract relied upon by Chevron, the trial court was correct in determining that Chevron was the borrowing employer of Mr. Howell and the other Elliott employees aboard the BIG JIM. Thus, Chevron is liable to Mr. Howell as a Jones Act employer for the negligence of the other Elliott employees aboard the BIG JIM.

Chevron's Limitation of Liability
Chevron raised as a defense the federal Limitation of Vessel Owners Liability Act, 46 U.S.C. App § 181, et seq. (the "Limitation Statute"). Chevron argues that, under the Limitation Statute, its liability is limited to the value of the BIG JIM in April, 1988. At trial, Chevron presented uncontradicted expert testimony that the value of the BIG JIM in April, 1988 was $125,000.
The trial court held that "a state court does not have jurisdiction to adjudicate a limitation of liability defense when there is no companion concursus proceeding pending in federal admiralty court." Thus, the trial court refused to consider Chevron's defense under the Limitation Statute. On appeal, Mr. Howell argues only that "the Limitation of Liability Act is not an available defense to a defendant that has not invoked such defense in Federal Admiralty Court within six months of receiving written notice that a claim would be made". In support of that argument, Mr. Howell cites Vatican Shrimp Co., Inc. v. Solis, 820 F.2d 674 (5th Cir.1987), cert. denied, 484 U.S. 953, 108 S.Ct. 345, 98 L.Ed.2d 371.
This very issue, whether the Limitation Statute may be raised as a defense in a state court action absent a concursus limitation proceeding in federal court, was considered in Mapco Petroleum, Inc. v. Memphis Barge Line, Inc., 849 S.W.2d 312, 1993 A.M.C. 2113 (Tenn.), cert. denied, 510 U.S. 815, 114 S.Ct. 64, 126 L.Ed.2d 33 (1993). The Mapco court, in a persuasive opinion whose reasoning we adopt as our own, held that the Limitation Statute may be raised as a defense in a state court action regardless of whether the vessel owner brings a limitation concursus proceeding in federal court.

*731 Section 183 is the substantive provision of the Limitation of Vessel Owner's Liability Act, 46 U.S.C. app. Section 181 et seq. It provides that the owner of a vessel can limit liability for losses occurring on the navigable waters of the United States to the value of the vessel and its freight, provided the loss occurred without the privity and knowledge of the owner or owners.
Aside from Section 183, Section 185 of the Act provides for a procedure known as a "concursus," whereby the vessel owner can file a petition in federal court evoking the limitation of liability provision of § 183. The purpose behind a Section 185 proceeding in federal court is to permit all actions against the vessel owner to be consolidated in a single case which will then dispose of all claims simultaneously. Complaint of Caldas, 1973 AMC 1243, 1255-56, 350 F.Supp. 566, 575 (E.D.Pa.1972), aff'd 485 F.2d 678, 679 (3 Cir.1973). Congress established the Section 185 concursus procedure because maritime casualties often involve interstate commerce with injuries to multiple parties with diverse domiciles. As a result, a ship owner can be subject to multiple suits by multiple parties in multiple forums. For whatever reasons, perhaps because of the lack of the threat of multiple suits, Memphis Barge did not file a Section 185 limitation of liability proceeding in federal court.
Although the Act specifically provides a procedure for limiting liability through the filing of a Section 185 petition in federal court, the U.S. Supreme Court has long recognized that this is not the exclusive means by which a vessel owner may assert the limitation defense under Section 183. The benefits of Section 183 can also be obtained by raising the limitation by way of answer to a suit commenced in state court against the vessel or its owner. Ex Parte Green, 286 U.S. 437, 52 S.Ct. 602, 76 L.Ed. 1212, 1932 AMC 802 (1932); Langnes v. Green, 282 U.S. 531, 51 S.Ct. 243, 75 L.Ed. 520, 1931 AMC 511 (1931); Carlisle Packing Co. v. Sandanger, 259 U.S. 255, 42 S.Ct. 475, 66 L.Ed. 927 (1922); The Scotland, 105 U.S. 24, 26 L.Ed. 1001 (1881). Thus, the rule is that the vessel owner may raise the Section 183 limitation defense in its answer in state court brought by the injured party under the saving to suitors clause of Section 1333, as well as in a concursus proceeding brought in federal court by the vessel owner under Section 185. Langnes, 282 U.S. at 540-41, 51 S.Ct. at 246-47, 1931 AMC at 518-19, Signal Oil & Gas Co. v. Barge W-701, [1982 AMC 2603, 2615] 654 F.2d 1164, 1173 (5 Cir.1981), The Chickie, [1944 AMC 635, 641-42] 141 F.2d 80, 84 (3rd Cir.1944). Accordingly, state courts have adjudicated the right of vessel owners to limit their liability under Section 183. See, e.g., Fishboats, Inc. v. Welzbacher, 413 So.2d 710, 717-19 (Miss.1982); The Golden Touch, 1967 AMC 353 (R.I.Super.Ct.1966), cert denied, 226 A.2d 505 (R.I.1967); De Pinto v. O'Donnell Transp. Co., [1943 AMC 567] 180 Misc. 649, 40 N.Y.S.2d 218 (N.Y.Sup. 1943); Loughin v. McCaulley, 186 Pa. 517, 40 A. 1020, 1021-22 (1898).
849 S.W.2d at 314-15.
The Mapco court also specifically addressed the issue of whether Vatican Shrimp (cited by Mr. Howell) and another case, Cincinnati Gas & Electric Co. v. Abel, 533 F.2d 1001 (6th Cir.1976), cert. denied, 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 136 (1976), stand for the proposition that a state court loses jurisdiction over a Limitation Statute defense if the plaintiff contests the vessel owner's right to limitation of liability, and concluded that those cases do not stand for such a proposition.

Vatican Shrimp and Cincinnati Gas, both cited by Mapco as authority that the trial court lacked jurisdiction to adjudicate the Section 183 limitation defense, involved essentially the same facts. In both cases, the injured party filed suit in state court and the vessel owner pled the limitation defense under Section 183. Thereafter, the vessel owners commenced Section 185 proceedings in federal court, but did so after the 6 month time period contained in Section 185 had expired. Thus, the narrow issue presented to the Fifth and Sixth Circuits in Vatican Shrimp and Cincinnati Gas was whether a vessel owner, by asserting the Section 183 limitation defense *732 as an affirmative defense in state court, tolled the time bar applicable to Section 185 for purposes of commencing limitation proceedings in federal court. In both cases, the court concluded that the Section 185 proceedings were not timely filed and dismissed the limitation petitions.
In support of its position in the instant case, Mapco points to various statements in Vatican Shrimp and Cincinnati Gas to the effect that "[w]hen the right to limited liability is contested it becomes impossible to dispose of all issues in a single proceeding in a state court." Cincinnati Gas, 1976 AMC at 572, 533 F.2d at 1004. Also, "[t]he state court lost jurisdiction of the limitation of liability issue when the claimant contested the owner's right to avail itself of limitation and only an admiralty court had jurisdiction to decide the issue." Id. 1976 AMC at 573, 533 F.2d at 1005.
These statements in Vatican Shrimp and Cincinnati Gas were made in the context of a vessel owner ultimately electing to proceed by way of Section 185 in federal court and have the limitation defense of Section 183 heard in that proceeding. Vatican Shrimp and Cincinnati Gas are unlike the present case where the vessel owner, Memphis Barge, elected to plead its Section 183 defense in the state court proceeding instead of a Section 185 petition in federal court. In other words, neither Vatican Shrimp or Cincinnati Gas addressed the precise issue before this Court which is whether a state court has jurisdiction to hear a Section 183 limitation defense when the vessel owner, instead of filing a Section 185 petition in federal court, elects to have the defense heard in state court by affirmatively pleading it. Rather, Vatican Shrimp nor Cincinnati Gas both address the question of whether a Section 185 petition, which by its express terms must be filed in federal court within 6 months, was filed timely, even though the vessel owner plead the Section 183 limitation defense in state court within the 6 months.
Moreover, Langnes and Ex parte Green, relied upon by Vatican Shrimp and Cincinnati Gas, must be viewed in a procedural posture distinct from the present case. In Ex parte Green, the follow-up to Langnes, the vessel owner, unlike Memphis Barge, had filed a Section 185 concursus proceeding in federal courtan action which, by the express terms of Section 185, specifically conferred exclusive jurisdiction on the federal court thereby removing the issue from the state court's jurisdiction. The vessel owner had invoked Section 185's statutory divestiture of concurrent subject matter jurisdiction. Memphis Barge has not.
849 S.W.2d at 317-18.
We conclude that the trial court did have jurisdiction over Chevron's defense under the Limitation Statute. No party offered evidence to contradict Chevron's expert testimony that the value of the BIG JIM in April 1988 was $125,000. No party has raised any other legal argument against Chevron's Limitation Statute defense. For example, no party has argued that the accident occurred with Chevron's privity or knowledge. Indeed, the trial court held that no Chevron representative was aboard at the time of the accident. Thus, Chevron's liability is limited to $125,000. Consequently, the judgment against Chevron must be reduced to $ 125,000.

Chevron's Indemnity Claim
The contract between Elliott and Chevron obligates Elliott to indemnify Chevron for any claims and expenses arising out of any injury to Elliott's employees:
Contractor [Tilden Elliott] agrees to defend and hold Company [Chevron] indemnified and harmless from and against any loss, expense, claim or demand for:
(a) Injury to or death of Contractor's employees or for damage to or loss of Contractor's property in any way arising out of or connected with the performance by Contractor of services hereunder.
Elliott argues that this indemnity provision is voided by the Louisiana Oilfield Indemnity Act, La.R.S. 9:2780 ("LOIA"). Chevron responds by arguing that the Chevron-Elliott contract is maritime in nature and thus governed by federal maritime law, rather than *733 Louisiana state law, so that the LOIA is not applicable.
A six-factor analysis is used to determine whether a contract is maritime or non-maritime:
1. What does the specific work order in effect at the time of the injury provide?
2. What work did the crew assigned under the work order actually do?
3. Was the crew assigned to work aboard a vessel in navigable waters?
4. To what extent did the work being done relate to the mission of that vessel?
5. What was the principal work of the injured worker?
6. What work was the injured worker actually doing at the time of the injury?
Davis & Sons, Inc. v. Gulf Oil Corp., 919 F.2d 313, 316 (5th Cir.1990). Accord Domingue v. Ocean Drilling and Exploration Co., 923 F.2d 393, 395 (5th Cir. 1991), cert. denied, Ocean Drilling & Exploration Co. (ODECO) v. Dimensional Oilfield Services Inc., 502 U.S. 1033, 112 S.Ct. 874, 116 L.Ed.2d 779 (1992).
We address each factor in turn. First, the work order was general, but called for work to be done on or from a vessel, the BIG JIM. Second, the crew did all of its work on or from the vessel BIG JIM. Third, the crew was assigned exclusively to the vessel BIG JIM which worked in navigable waters. Fourth, the work being done at the time of Mr. Howell's accident was directly related to the vessel BIG JIM's mission of servicing Chevron oil and gas platforms. Fifth, Mr. Howell's principal work was operation of a significant piece of equipment of a vessel, the BIG JIM's crane, as well as manning the wheelhouse and navigating the BIG JIM and maintaining its engines and generators. Sixth, at the time of his injury, Mr. Howell was working on the Chevron platform, rather than aboard the BIG JIM, although that vessel was next to the platform. In sum, the first five of the six factors point to the contract being maritime in nature and the sixth is somewhat equivocal in import.
In Brennan v. Shell Offshore, Inc., 612 So.2d 929, 933-34 (La.App. 4th Cir.), writ denied, 614 So.2d 1268 (La.1993), the plaintiff was an offshore welder and we held the contract involved to be non-maritime. He was assigned to the oil company's supervisor rather than to a vessel. In the present case, Mr. Howell was assigned to a vessel, the BIG JIM. In Brennan, the contract called for the contractor to supply services to platforms and production facilities in a particular field. In the present case, the contract between Elliott and Chevron called for Elliott to supply the crew for a particular vessel, the BIG JIM. In Brennan, the plaintiff welded aboard a jack up barge while it was jacked up so that it was "similar to a fixed platform". 612 So.2d at 934. In the present case, Mr. Howell did 80% of his work aboard the BIG JIM and that work included manning the wheelhouse and navigating the BIG JIM and maintaining its engines and generators. Thus, Brennan is clearly distinguishable from the present case.
In Sampsell v. B & I Welding Services & Consultants, Inc., 618 So.2d 1137 (La.App. 4th Cir.), writs denied, 629 So.2d 346 (La. 1993), the plaintiff also was a welder and we held the contract involved to be maritime. In Sampsell, the work to be done by the contractor's employees took place exclusively aboard a vessel, a pipe laying barge, in navigable waters. The work done was "inextricably intertwined with maritime activities since it required the use of a vessel and its crew." 618 So.2d at 1139. The present case is somewhat unlike Sampsell in that, in the present case, some of the Elliott crew's work was done aboard Chevron platforms. On the other hand, the work of Mr. Howell in particular was concentrated 80% on board the BIG JIM itself. Also, like Sampsell, and unlike Brennan, the barge involved was not a jack-up barge and never resembled a fixed platform. Overall, the facts of the present case are more like those found determinative in Sampsell than those found determinative in Brennan.
We conclude that the Elliott-Chevron contract, which revolved around the provision of *734 the complete crew for a vessel in navigable waters, is a maritime contract governed by federal maritime law rather than Louisiana state law. Thus, the indemnity provision of the Elliott-Chevron contract is enforceable and Chevron is entitled to indemnity from Elliott for any liability of Chevron to Mr. Howell and for Chevron's expenses (attorney's fees, etc.) for this lawsuit. We will remand for a determination of these Chevron expenses.

Damages and Medical Causation
Mr. Howell suffered some relatively minor back injuries in minor accidents prior to the April 20, 1988 accident. He began to suffer severe back pain and disabling symptoms on May 9, 1988 while engaged in the routine apparently nonstrenuous tightening of a bolt. He underwent surgery in October, 1988 and was released by his doctor at the end of January, 1989. The doctor gave Mr. Howell a note stating that Mr. Howell continued to suffer from weakness and severe muscular atrophy and that this should be given consideration by his employer in assigning his job duties. Mr. Howell was able to work until November, 1989 but, in that month, while engaged in the routine and apparently nonstrenuous changing of a car tire, he again began to suffer severe back pain and disabling symptoms. He has been unable to work since that time. Mr. Howell was treated by various physicians beginning in early December, 1989 and he eventually underwent a second back surgery in February, 1993.
The key issue with respect to damages is causation. The trial court found that the severe back pain and disabling symptoms beginning on May 9, 1988, which necessitated the first back surgery in October, 1988, were caused entirely by the April 20, 1988 accident and that prior back injuries did not contribute to the back pain and disabling symptoms. In other words, the trial court found that the back pain and disabling symptoms arose from an entirely new injury caused by the April 20, 1988 accident. However, the trial court found that the severe back pain and disabling symptoms that began anew in November, 1989 were not caused by the April 20, 1988 accident. Instead, the trial court attributed the back pain and symptoms which began in November, 1989 entirely to minor back injuries which had predated the April 20, 1988 accident.
With respect to the back pain and disabling symptoms that began in November, 1989, the trial court applied Louisiana law to the causation issue. The trial court held that: "[g]enerally, it is accepted that if a plaintiff is injured through the negligence of another and his injury is subsequently aggravated by other acts, the original tort-feasor is only liable for the original injury." The trial court cited, quoted and discussed several Louisiana duty-risk analysis decisions in support of the just-quoted legal proposition. However, whatever might be the merits of that legal proposition as a matter of Louisiana law (a point as to which we express no opinion), it is inconsistent with the law of causation applicable to claims under the Jones Act, which, of course, is a federal statute.
Under the Jones Act, the legal test for causation is significantly different, and the plaintiff's burden of proof as to causation is significantly less than in ordinary personal injury tort litigation. The plaintiff "is entitled to recovery under the Jones Act if he adduced probative evidence that [the defendant's] negligence played any parthowever smallin the development of his condition." Davis v. Odeco, Inc., 18 F.3d 1237 (5th Cir.), cert. denied, 513 U.S. 819, 115 S.Ct. 78, 130 L.Ed.2d 32 (1994) (emphasis in original). Causation can be inferred from "unexplained events". Id. "We have described the burden of the plaintiff for showing causation in a Jones Act claim as `featherweight'." Johnson v. Offshore Express, Inc., 845 F.2d 1347, 1352-53 (5th Cir.), cert. denied, Offshore Exp., Inc. v. Johnson, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 (1988). Accord Alverez v. J. Ray McDermott & Co., Inc., 674 F.2d 1037, 1042 (5th Cir.1982). See Ellen M. Flynn, et al. 1B Benedict On Admiralty Section 21 (6th ed. 1993) (Jones Act requires only that defendant's negligent act or omission have played any parteven the slightestin producing plaintiff's injury).
The trial court's Reasons for Judgment do not mention the Jones Act "featherweight" *735 standard as to proof of causation and, as we have discussed above, instead applied the Louisiana duty-risk analysis to the causation issue. Thus, it is apparent that the "featherweight" standard was not applied below to the causation issue. Consequently, we will make a de novo determination of that issue based upon the record below.
Dr. Toppolo, who treated Mr. Howell for an extended period of time after the renewal of back pain and disabling symptoms in November 1989, and who performed the second surgery, testified that the April 20,1988 accident, the May 9, 1988 bolt-turning incident, the October, 1988 first surgery, and the November, 1989 renewal of back pain and disabling symptoms were all "a continuum." He also testified that the first surgery in October, 1988, which included a cervical fusion, placed additional stress and strain on other parts of the cervical spine and increased the potential for problems at those other parts. He felt that this put Mr. Howell's spine at greater risk of injury from normal activities.
Dr. Zuckerman, a neurologist, also treated Mr. Howell after the renewal of back pain and disabling symptoms in November, 1989. He "directly related" the pain and symptoms beginning in November, 1989 to the October, 1988 first surgery. He opined that the weakened condition of Mr. Howell's spine predisposed him to injury from activities like the car tire changing in November, 1989.
We believe that, under the Jones Act "featherweight" standard for proof of causation, Mr. Howell has met his burden of showing that his back pain and disabling symptoms which began anew in November, 1989 were caused, at least in some slight part, by the April 20, 1988 accident. We accept the trial court's determination of $150,000 general damages for the pain and suffering, etc. from May 9, 1989 until January, 1989. We do not feel that the trial court has abused its "vast discretion" in setting the general damages for that period of time. See Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, Maritime Overseas Corp. v. Youn, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Theriot v. Allstate Ins. Co., 625 So.2d 1337 (La.1993). However, general damages must also be awarded for the period from November, 1989 to the time of trial in January, 1994.
Mr. Howell testified that the pain of recovery from the second surgery was much, much greater than the pain from the first surgery. He also testified as to not only physical pain, but mental and emotional suffering from the time of the renewal of his back pain and disabling symptoms in November, 1989. Further, the trial court awarded $150,000 general damages for the roughly nine month period from May 9, 1988 to January, 1989, while we must consider a period of roughly fifty months from November, 1989 to January, 1994. We believe that the general damages for this latter period must be at least double those awarded by the trial court for the earlier period, so we award an additional $300,000 in general damages.
In conjunction with its findings as to causation in the Jones Act context, the trial court noted that its findings of lack of causation as to the pain and disabling symptoms beginning in November, 1989 also precluded Mr. Howell's claim that maintenance and cure benefits should have been reinstated in November, 1989. A claim for maintenance and cure arises under the general maritime law, rather than the Jones Act, and so the Jones Act's "featherweight" standard as to causation does not apply to Mr. Howell's claim for maintenance and cure. Thus, the trial court did not apply the wrong legal standard to Mr. Howell's maintenance and cure claim. Consequently, we will review the trial court's denial of maintenance and cure under the clearly wrong/manifest error standard of appellate review. Ambrose, supra; Stobart, supra; Rosell, supra. As the medical testimony was not unequivocal, as there was a ten month gap between the January 1989 release of Mr. Howell by his doctor and the November 1989 renewal of his back pain and disabling symptoms, and as Mr. Howell admitted to a history of minor back injury predating the April 20, 1988 accident, we do not find that the trial court was clearly wrong or manifestly erroneous in its finding *736 that maintenance and cure need not have been reinstated in November 1989.[2]
The trial court's Judgment and Reasons for Judgment do not address Mr. Howell's claim for lost wages. Mr. Howell points out that, even under the trial court's rulings as to causation on his Jones Act claim, he is entitled to lost wages for the period May 9, 1988 until January, 1989. Mr. Howell is correct in that regard and so we will remand for a determination of the amount of such lost wages for that period. Further, Mr. Howell claims lost wages for the period since the renewal of his back pain and disabling symptoms in November, 1989. Under our holding in this appeal as to causation on his Jones Act claim, Mr. Howell is correct in that respect as well, and so we will remand for a determination of such lost wages.
The trial court's Judgment and Reasons for Judgment do not address Mr. Howell's claim for medical expenses. Mr. Howell does not argue that he should be awarded medical expenses for the period from May 9, 1988 to January, 1989. Presumably, this is because CNA paid such expenses as part of its maintenance and cure benefit payments during that period. Mr. Howell does argue that he should be awarded "past" medical expenses for the period November, 1989 through the January, 1994 trial and "future" medical expenses from the date of the trial forward. Under our holding in this appeal as to causation on Mr. Howell's Jones Act claim, he is entitled to past medical expenses from November, 1989 to the date of trial and, if he has made the proper factual showing as to the likelihood of future medical expenses, then he also is entitled to such future medical expenses from the date of trial. We will remand for a determination of the amount of past medical expenses, a factual determination of the likelihood of future medical expenses and, if there has been the proper factual showing as to the likelihood of future medical expenses, a determination of the amount of future medical expenses.

Retaliatory Discharge
Mr. Howell argues that he was discharged by Elliott because he was going to file a Jones Act suit. He further argues that such retaliatory discharge gives rise to a tort action under maritime law. See Smith v. Atlas Off-Shore Boat Service, Inc., 653 F.2d 1057, 1064 (5th Cir.1981) (burden of proof in maritime abusive discharge claim). However, there is no evidence that Mr. Howell was discharged in retaliation for filing (or planning to file) a Jones Act lawsuit or any other lawsuit.
Mr. Howell testified that, upon his release by his doctor in January, 1989, he went to Elliott and sought to resume his job. He was told by Mr. Elliott that there was no work for Mr. Howell to do. Mr. Howell testified that Mr. Elliott was angry, arrogant and did not want to talk to Mr. Howell. Also, Mr. Howell testified that he spoke to the foreman of the BIG JIM who said simply that he knew nothing about it. Lastly, Mr. Howell testified that he learned that Elliott has hired four new employees since he left due to his injury.
It seems perfectly reasonable that Mr. Howell's position on the crew of the BIG JIM was filled during the approximately nine months that he had been unable to work. It seems unlikely that, with a crew of only eight when fully staffed, the BIG JIM would have been left a man short-handed for nine *737 months. This is particularly so because Elliott's contract with Chevron required Elliott to provide a crew of eight and because Elliott was paid according to the size and composition of the crew so that leaving a vacancy would have resulted in lesser Chevron payments to Elliott. Thus, Mr. Elliott's statement that there was no work for Mr. Howell likely reflected the fact that Mr. Howell's position on the BIG JIM's crew had been filled by a replacement. If Elliott had hired four new employees, that would be indicative of Elliott filling vacancies such as that left by Mr. Howell's departure due to injury. The fact that Mr. Elliott did not want to talk to Mr. Howell could simply reflect that he did not need Mr. Howell for his crew. The fact that Mr. Elliott was arrogant or angry could reflect that he did not want to be bothered with what was, to him, a distraction when he was trying to get his crew off to work for the day (which, apparently, was the time at which Mr. Howell saw him).
The Smith decision suggests that, due to "difficult factual questions and issues of proof inherent in the claim for retaliatory discharge" there is a special burden of proof on the plaintiff to "affirmatively establish that the employer's decision was motivated in substantial part by the knowledge that the seaman either intends to file, or has already filed, a personal injury action against the employer." 653 F.2d at 1063-64. But, even under an ordinary burden of proof, Mr. Howell has failed to show that he was the victim of a retaliatory discharge.

Legal Interest
The trial court awarded prejudgment interest on the damages awarded to Mr. Howell. The defendants argue that, because Mr. Howell recovered under the Jones Act, he is not entitled to any prejudgment interest or, at any rate, is not entitled to prejudgment interest on future damages.
The issue is governed by the recent decision Milstead v. Diamond M Offshore, Inc., 95-2446 (La.7/2/96), 676 So.2d 89. The trial court did not have the benefit of the Milstead decision which was handed down after the trial court had rendered its judgment below.
In Milstead, the plaintiff had recovered under both the Jones Act and general maritime law following a trial without a jury. The Milstead trial court had not apportioned its damages award into past and future damages and awarded prejudgment interest on the entire damages award.
The Supreme Court, in Milstead, first held that the issue of prejudgment interest on damages recovered under the Jones Act is governed by federal law. The Supreme Court then held that, under federal law, when a Jones Act case is tried as an admiralty case without a jury (as in the present case), then the trial court has discretion as to whether to award prejudgment interest on past damages but may not award prejudgment interest on future damages.
In the present case, the general damages awarded by the trial court, and the additional general damages we have awarded in this appeal, are all for past damages (i.e. for periods prior to trial) and so prejudgment interest was properly awarded as to general damages. On remand, when the trial court determines the amounts of past (i.e. for periods prior to trial) medical expenses and lost wages it will have discretion as to whether to award prejudgment interest on those amounts. However, if the trial court determines that Mr. Howell is entitled to damages for future (i.e. for periods after trial) medical expenses and lost wages, it may not award prejudgment interest on such amounts.
In Milstead, the courts below had run prejudgment interest from the date of judicial demand rather than from the date of the accident. However, the Supreme Court did not address that issue in Milstead. The Supreme Court did emphasize that the award of prejudgment interest in maritime law (including Jones Act) cases is governed by federal law. Under federal law, prejudgment interest in maritime cases runs from the date of the injury rather than from the date of judicial demand. Corliss v. Elevating Boats, Inc., 599 So.2d 434, 438 (La.App. 4th Cir. 1992). Thus, in the present case, prejudgment interest will run from the April 20,1988 accident date.

*738 CONCLUSION
We AMEND the judgment of $150,000 in favor of Mr. Howell and against Elliott and Lloyd's to $450,000.
We RENDER judgment in favor of Mr. Howell and against Elliott and Lloyd's for Mr. Howell's lost wages from May 9, 1988 to January 1989 and REMAND for determination of that amount.
We RENDER judgment in favor of Mr. Howell and against Elliott and Lloyd's for Mr. Howell's past lost wages and past medical expenses for the period November 1989 to the date of trial and REMAND for a determination of the quantum of such past lost wages and past medical expenses.
We REMAND for a factual determination of whether Mr. Howell is entitled to future lost wages and future medical expenses (from the date of trial) and if so, for a determination of the amount of such future lost wages and future medical expenses.
We AMEND the judgment in favor of Mr. Howell and against Chevron to reduce the amount of that judgment from $150,000 to $125,000.
We REVERSE the judgment in favor of Mr. Howell and against CNA and RENDER judgment dismissing his claims against CNA and Lloyd's.
We REVERSE the judgment in favor of Elliott and against CNA and RENDER judgment dismissing Elliott's cross-claim against CNA.
We REVERSE the judgment dismissing Chevron's cross-claim against Elliott, we RENDER judgment as to liability for indemnity in favor of Chevron against Elliott, and we REMAND for determination of the amount of the indemnity owed to Chevron by Elliott.
We RENDER judgment in favor of Elliott and against Lloyd's for coverage and for Elliott's costs of defense against Mr. Howell's claim, and we REMAND for determination of the amount of such costs of defense. Legal interest on the amount of such costs of defense will run from the date of determination of that amount by the trial court's judgment on remand.
AFFIRMED IN PART; AMENDED AS AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
NOTES
[1] No party challenges the trial court's finding that there was no unseaworthiness.
[2] Elliott argues that general damages of any kind may not be awarded under the Jones Act and cites in support of that proposition Miles v. Apex Marine Corp., 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990); Lollie v. Brown Marine Service, Inc., 995 F.2d 1565 (11th Cir.1993); Murray v. Anthony J. Bertucci Construction Co., Inc., 958 F.2d 127 (5th Cir.1992), cert. denied, 506 U.S. 865, 113 S.Ct. 190, 121 L.Ed.2d 134 (1992); Michel v. Total Transportation, Inc., 957 F.2d 186 (5th Cir.1992). However, none of those cases stands for that proposition. Miles held that "There is no recovery for loss of society in a Jones Act wrongful death action". 498 U.S. at 32, 111 S.Ct. at 325. Lollie held that "neither the Jones Act nor general maritime law authorizes recovery for loss of society or consortium". 995 F.2d at 1565. Murray held that "Miles, properly extended, precludes an injured seaman's wife from recovering loss of society". 958 F.2d at 128. Michel held that "damages recoverable in general maritime causes of action for personal injury of a Jones Act seaman do not include loss of consortium". 957 F.2d at 191. In the present case, the trial court made no award for loss of society or loss of consortium, so the cases cited by Elliott are not on point.